# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

_____

DANIEL HARRISON,

     Plaintiff,

    v.                            1:24-cv-00724 KWR/JFR

ENRIQUE BURSZTYN,
RADIOLOGY ASSOCIATES OF ALBUQUERQUE,
THE BOARD OF COUNTY COMMISSIONERS OF
THE COUNTY OF CURRY, PRESBYTERIAN
HEALTHCARE SERVICES, INC., PETER DURSO, _MD,_

     Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court upon the following motions:

- Plaintiff's Motion for Leave to File Amended Complaint (Doc. 39);

- Defendant Presbyterian Healthcare Services' Motion for Summary Judgment on Plaintiff's Directs Claims against it and Claims for Vicarious Liability for its Employees (Doc. 55);

- Plaintiff's Motion for Partial Summary Judgment (Doc. 71); and

- Presbyterian Healthcare Services' Motion to Exclude Plaintiff's Experts' Affidavits (Doc. 91).

In relevant part, Plaintiff and Defendant Presbyterian Healthcare Services, Inc. ("PHS") both move for summary judgment on the Emergency Medical Treatment and Labor Act ("EMTALA") claim (Count V), the sole federal claim in this case. Having considered the briefing, the record, and the relevant law, the Court concludes that Plaintiff has failed to establish a genuine dispute of material fact as to his EMTALA claim. The Court therefore enters summary judgment

on the EMTALA claim (Count V) in Defendant PHS's favor and dismisses the claim. Moreover, the Court declines to exercise supplemental jurisdiction over the state law claims and **REMANDS** those claims to state court.

## BACKGROUND

Plaintiff suffered a stroke while in custody. He asserts that Defendants were negligent or failed to provide adequate medical care, which includes failing to identify and treat his stroke. Plaintiff asserts claims against the following groups of defendants: (1) The Board of County Commissioners of the County of Curry ("Curry County"), which operated the detention center where he was detained; (2) Presbyterian Healthcare Services ("PHS"), which operated Plains Regional Medical Center where Plaintiff was taken for emergency medical treatment; (3) Radiology Associates of Albuquerque and its employees or contractors (Dr. Bursztyn), related to the alleged negligent interpretation of his CT scan; and (4) Dr. Durso, a doctor who treated Plaintiff in the emergency room at Plains Regional Medical Center.

On May 16, 2019, while detained pretrial at Curry County Detention Center, Plaintiff was seen by Wellpath nurses for severely elevated blood pressure. Plaintiff alleged that he had signs of a stroke, including elevated blood pressure, a headache, inability to feel his legs, inability to walk, dizziness, weakness, lethargy, and lack of coordinated movement. Plaintiff was taken to the emergency room at Plains Regional Medical Center, a PHS facility. Plaintiff alleges that he was evaluated by Dr. Durso, and underwent a CT scan, which was interpreted by a radiologist at Radiology Associates of Albuquerque. The radiologist allegedly reported normal findings. Plaintiff alleges that the doctors and PHS failed to identify or treat his stroke. Plaintiff was treated for hypertension and discharged.

Plaintiff asserted the following claims in his Complaint:

2

Count I: Failure to Provide Medical Care and Treatment against Defendant the Board of
   County Commissioners of the County of Curry

Count II: Failure to Train and Supervise against Defendant the Board of County
   Commissioners of the County of Curry

Count III: Negligence against Defendant the Board of County Commissioners of the
   County of Curry

Count IV: Medical Negligence against PHS, RAA, Durso, and Bursztyn

Count V: Violation of EMTALA against Defendant PHS

Count VI: Claim for Negligent Hiring, Training and Supervision against Defendant
   PHS

Count VII: Lost Opportunity for Better Medical Outcome against Medical Defendants

Count VIII: Compensatory Damages

Count IX: Punitive Damages against Medical Defendants

*See* Complaint, **Doc. 1-1, Ex. A**; *see also* Proposed First Amended Complaint, Doc. 39-1.

## FACTS

Plaintiff and Defendant PHS filed cross-motions for summary judgment on the EMTALA claim. Both parties incorporate their briefing on the cross-motions by reference. *See* Def. PHS's Reply to Mot. Summ. J., Doc. 95 at 9 (Defendant PHS incorporating by reference its response to Plaintiff's Partial Motion for Summary Judgment on EMTALA claim); Pl.'s Resp., Doc. 81 at 10. Therefore, the Court will consider the briefing on the cross-motions and the asserted facts together.

Plaintiff expressly admitted to Defendant PHS's facts asserted in its response (Doc. 87), or otherwise did not dispute the facts by citation to the record or by showing that Defendant PHS's asserted facts were not supported by the record. *See* Pl.'s Reply, Doc. 114 at 6-7; Fed. R. Civ. P.

56(c)(1)(A), (B) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by… citing to particular parts of materials in the record… or… showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact"). Plaintiff asserted that some facts were not material or were ambiguous. Doc. 114 at 6-7. Therefore, the Court considers Defendant PHS's asserted facts in its response to Plaintiff's Partial Motion for Summary Judgment as expressly admitted or undisputed.  *See* Doc. 87, Def.'s Undisputed Material Facts ("Def.'s UMF") ¶ 1-62.

## I.    Plaintiff was admitted to Plains Regional Medical Center and triaged by Nurse Bradley.

On May 16, 2019, Plaintiff was detained at Curry County Detention Center. Jail staff found him with severely elevated blood pressure and jail medical staff gave him two doses of Clonidine. Pl.'s Undisputed Material Fact ("UMF") 1, Doc. 71. Plaintiff was unable to stand without assistance. *Id.* Jail medical staff notified emergency medical services who transported him to Plains Regional Medical Center, a PHS facility. *Id.* Jail medical staff provided Defendant PHS with a direct admit referral request form, which stated that he was lethargic and had a high blood pressure reading of 188/114 after administration of Clonidine. Doc. 71, Ex. 3.

Plaintiff was triaged in the emergency department at Plains Regional Medical Center by Nurse Keisha Bradley. *See* Def.'s Undisputed Material Fact ("UMF") 1, Doc. 87, *citing* Doc. 87, Ex. B, D. Nurse Bradley testified that detainees are treated as "a patient just like everybody else." Def.'s UMF 2, *citing* Bradley Dep., Doc. 87, Ex. C; *see also* Pl.'s UMF 6, Doc. 71.  However, Plaintiff remained handcuffed.  Pl.'s UMF 3, Doc. 71.[1]

---

[1] Plaintiff also asserted in his UMF 3 that he could not perform basis functions without assistance, but this assertion is not supported by his citation to the record.  *See* Doc. 71 at 4. Rather, the record

Nurse Bradley testified that for triage to begin, "[w]e're hooking them up to the monitor. We're asking the patient questions about what's going on, what brings them in, just questions about what's happening with them. And we're getting their vital signs and assessing them." Def.'s UMF 3, Doc. 87, *citing* Doc. 87, Ex. C at 32:4-11.

Nurse Bradley stated that she asks patients if they have any symptoms, including "chest pain, any numbness or tingling in their extremities, can move everything appropriately, how long ago did this start, do they have a headache, do they have blurred vision, things like that." Bradley Dep., Doc. 71-4 at 46:1-20. If a patient told her they had a headache, she would note it and notify a physician. *Id.*; Def.'s UMF 5, Doc. 87. She only notes "significant things that they say are going on." Bradley Dep., Doc. 71-4. at 48:12-17;[2] Def.'s UMF 4, Doc. 87. Nurse Bradley testified that had Plaintiff reported a headache or numbness, she would have noted it in her notes and notified the physician. Def.'s UMF 6, Doc. 87.

When triaging a patient from the detention center, Nurse Bradley testified that sometimes the corrections officers would state why the patient was brought to the emergency room, "but if they were brought by ambulance, then EMS tells us, but most of the time, we're just speaking with the patient." Def.'s UMF 7, Doc. 87-2; Bradley Dep., Doc. 87-2, Ex. B at 32:6-19.

After triage, orders were entered for lab work, an x-ray, an imaging exam, a CT scan, and an EKG. Def.'s UMF 8, Doc. 87.

Nurse Bradley documented at 9:04 am, in part, that Plaintiff stated a history of hypertension and that he was compliant with medications. Def.'s UMF 9, Doc. 87. Nurse Bradley documented

---

reflected that "[h]e is sitting up in his bed and eating meal… [Patient] denies needs at this time…. Patient has eaten most of his meal without assistance." Doc. 71-5 at 2-3.

[2] In Plaintiff's UMF 8, he asserts that Nurse Bradley did not ask him whether he was dizzy or had a headache. *See* Doc. 71 at 8. But this assertion is not supported by the cited record. *Id.*

at 10:31 am, in part, that Plaintiff "remains having pedal cramping but denies other needs." Def.'s UMF 10, Doc. 87. Nurse Bradley documented at 10:31 am, in part, that Plaintiff "remains able to answer questions and speaking to staff appropriately." Def.'s UMF 11, Doc. 87. Nurse Bradley documented at 11:36 am, "[Plaintiff] provided with sandwich bag and water. He is sitting up in bed and eating meal with guard at bedside. [Plaintiff] remains with one arm cuffed and one arm loose to eat. Pt denies needs at this time." Def.'s UMF 12, Doc. 87.

Nurse Bradley documented at 12:15 pm that "[Plaintiff] has eaten most of meal without assist. [Plaintiff] able to verbalize to staff his needs without complication. [Plaintiff] covered back up per request." Def.'s UMF 13, Doc. 87.

Nurse Bradley documented at 1:15 pm, "[Plaintiff] requesting socks, ok with guards to go to facility." Def.'s UMF 14, Doc. 87. She documented at 1:20 pm, "[Plaintiff] pushes feet to assist staff to help get his socks on without complication." Def.'s UMF 15, Doc. 87. Plaintiff was able to assist with putting on his socks despite being restrained.  Pl.'s UMF 4, Doc. 71.  Nurse Bradley testified that if a young, otherwise healthy individual was unable to put on their own socks, that would be a red flag requiring further assessment. Pl.'s UMF 5, Doc. 71.  Although Plaintiff asserts that he should have been uncuffed to put on his own socks to assess his motor function, Plaintiff did not cite to the record to show there is a standard "sock procedure" evaluation of patient motor function at Plains Regional Medical Center's emergency department.

The following lab work was completed during Plaintiff's emergency department admission: a rapid urine drug screen, urinalysis with culture if indicated, PTT, PT (Prothrombin Time), Pro-BNP N-Terminal, Troponin I, Comprehensive Metabolic Panel, and a CBC with Differential. Def.'s UMF 16, Doc. 87.

## II.    <u>Dr. Durso's examination of Plaintiff.</u>

Dr. Durso talked with Plaintiff about his condition while in the emergency department and examined him. Def.'s UMF 17, Doc. 87. Dr. Durso completed certain notes in the medical record with the assistance of a scribe. Dr. Durso testified that the portion of the medical record called "History of Present Illness" is "basically a narrative of what information we're given from patient or persons related to patient or taking care of patient, to describe why they're in the emergency room." Def.'s UMF 18, Doc. 87 at 14.[3] Dr. Durso testified that the portion of the medical record called "Review of Systems" is "a series of questions we ask, not necessarily related to the patient's complaint, but just to get a further overview of their general state of health at the time of visit." and that they are "questions directed to the patient" and "typically, it's me asking the patient direct questions about how they're feeling is how it usually goes." Def.'s UMF 19, Doc. 87. Dr. Durso testified that he could state "unequivocally" that it is not possible that Plaintiff would not have been responding to questions from him while in the emergency room. Def.'s UMF 20, Doc. 87.

Dr. Durso stated that "[b]ased on what the patient tells us happened, that's how we determine what exam maneuvers to do, what labs to do, what imaging to do… It's the first step in the process – getting the patient's story and what they're feeling." Durso Dep., Doc. 87, Ex. C at 49:17-25; Pl.'s UMF 13, Doc. 71.

---

[3] Plaintiff, in his UMF 14, states that contrary to standard practice, he recorded in the Review of Symptoms portion of the medical record symptoms such dizziness and unsteady gait as being provided by jail staff. Doc. 71 at 6. The assertion that this was contrary to standard screening procedure at the emergency department is not supported by the cited record. *See Id.*  Dr. Durso testified as to his own practice, rather than Defendant PHS's practice.  Moreover, Dr. Durso stated that the "History of Present Illness" section of the medical record includes information from persons related to the patient or taking care of a patient.  Durso Dep., Doc. 87, Ex. C. at 14:23-15:1-6. Dr. Durso stated that the unsteadiness and dizziness was likely auto-populated from the "History of Present Illness" section into the "Review of Symptoms" section of the medical record. *Id.* at 23:17-24:7. Nurse Bradley noted that jail staff or EMS would provide information as well. Bradley Dep., Doc. 87-2, Ex. B at 32:12-19. Therefore, the record does not support the assertion that receiving information from jail staff violates Defendant PHS's standard screening practice in the emergency department at Plains Regional Medical Center.

When asked whether she is "looking at these other symptoms," Nurse Bradley testified, "Yes. We're asking him if – the patient if they're having any other symptoms." Def.'s UMF 23, Doc. 87.

Dr. Durso documented that he did a physical examination of Plaintiff while in the emergency department. Def.'s UMF 21, Doc. 87. Dr. Durso testified that he would "only document the significant things that they say are going on." Def.'s UMF 22, Doc. 87.

Dr. Durso's notes regarding his examination of Plaintiff in the medical chart were as follows.

- Plaintiff was "oriented to person, place, and time. He appears well-developed and well-nourished. No distress." Def.'s UMF 24, Doc. 87.

- Regarding Plaintiff's head, Dr. Durso noted: "Normocephalic and atraumatic." Def.'s UMF 25, Doc. 87.

- As to Plaintiff's mouth/throat, Dr. Durso noted: "Oropharynx is clear and moist." Def.'s UMF 26, Doc. 87.

- As to Plaintiff's eyes, Dr. Durso noted: "Pupils are equal, round, and reactive to light. Conjunctivae and EOM are normal." Def.'s UMF 27, Doc. 87.

- As to Plaintiff's neck, Dr. Durso noted: "Normal range of motion. Neck supple." Def.'s UMF 28, Doc. 87.

- As to the cardiovascular exam, Dr. Durso noted: "Normal rate, regular rhythm and normal heart sounds. Exam reveals no gallop and no friction rub. No murmur heard." Def.'s UMF 29, Doc. 87.

- As to his Pulmonary/Chest exam, Dr. Durso noted that "Effort normal and breath sounds normal. No respiratory distress. He has no wheezes. He has no rales." Def.'s UMF 30, Doc. 87.

- As to his exam of Plaintiff's abdomen, Dr. Durso noted: "Soft. Bowel sounds are normal. He exhibits no distension. There is no tenderness. There is no rebound and no guarding." Def.'s UMF 31, Doc. 87.

- After his musculoskeletal exam, Dr. Durso noted: "Normal range of motion. He exhibits no edema or deformity." Def.'s UMF 32, Doc. 87. 33.

- After conducting a neurological exam, Dr. Durso noted: "He is alert and oriented to person, place, and time. No cranial nerve deficit. -Pt is awake, alert and answering questions approprietly [sic]. -Moves all extremities normally." Def.'s UMF 33, Doc. 87.

- Dr. Durso noted that Plaintiff's "Skin is warm and dry." Def.'s UMF 36, Doc. 87.

- Finally, Dr. Durso noted after a psychological exam that "He has a normal mood and affect. His behavior is normal." Def.'s UMF 37, Doc. 87.

Dr. Durso testified that he tested for dysarthria during the physical exam "[b]y speaking to the patient" and if Plaintiff did have dysarthria as a positive finding, it would have been documented in the physical exam. *See* Def.'s UMF 34, Doc. 87, *citing* Doc. 87, Durso Dep., Exhibit C at 44:15-25. Dr. Durso testified that he does a series of maneuvers as part of his routine neurological exam to test the cranial nerves. Def.'s UMF 35, Doc. 87, *citing* Doc. 87, Durso Dep., Exhibit C at 25:22-27:16.

Dr. Durso documented that he reviewed the nursing note and vitals. Def.'s UMF 38, Doc. 87. Dr. Durso ordered medications for Plaintiff including hydrochlorothiazide, clonidine HCl, and

labetalol. Def.'s UMF 39, Doc. 87.  Plaintiff was given labetalol by Nurse Bradley at 10:40 am. Def.'s UMF 40, Doc. 87. Plaintiff was given a clonidine HCl tablet 0.1 mg by Nurse Bradley at 10:40 am and again at 12:54 pm. Def.'s UMF 41, Doc. 87. Plaintiff refused a hydrochlorothiazide tablet 25 mg from Nurse Bradley at 12:25 pm. Def.'s UMF 42, Doc. 87.

Plaintiff asserts that Dr. Durso failed to "walk" him.  Pl.'s UMF 18, Doc. 71. Dr. Durso testified he can't tell from the record whether he observed Plaintiff walking or ambulating as part of his exam.  Durso Dep., Doc. 71-6, Ex. 6 at 41:7-16.  However, Plaintiff does not cite to the record to demonstrate it is standard procedure at the emergency department at Plains Regional Medical Center to observe a patient walking or ambulating as part of the examination.

Plaintiff asserts that Dr. Durso did not test for speech or motor symptoms. Pl.'s UMF 20, Doc. 71.  But Dr. Durso testified that he tested Plaintiff's speech by speaking with him, and as noted above motor functions were evaluated.  Durso Dep., Doc. 71-6, Ex. 6 at 43:7-12.  Plaintiff does not cite to the record to demonstrate that speaking with a patient is not an adequate examination of dysarthria or violates Defendant PHS's standard screening procedures.

Plaintiff asserts that Dr. Durso did not evaluate his mental status.  Pl.'s UMF 24, Doc. 71. This is contradicted by the record, in which Dr. Durso documented under Plaintiff's neurological assessment that he was "alert and oriented to person, place and time" and had "[n]o cranial nerve deficit" based upon a series of maneuvers he does as part of his routine to test the cranial nerves. Durso Dep., Doc. 87, Ex. C. at 24:22-27:20.

Plaintiff asserts that jail staff reported that Plaintiff had a history of noncompliance with his medication.  Pl.'s UMF 26, Doc. 71.

III.    **Dr. Durso ordered tests and imaging.**

Plaintiff had an x-ray of his chest with two views, PA and lateral. Def.'s UMF 43, Doc. 87. The "impression" on the report of x-ray of the chest stated, "[n]o evidence of active cardiopulmonary disease. Suggestion of the presence of a fracture in the posterior right sixth rib. No infiltrates or effusions." Def.'s UMF 44, Doc. 87. Plaintiff had a CT without contrast performed while in the emergency department as ordered by Dr. Durso for the "Clinical Indication" of "Dizziness." Def.'s UMF 45, Doc. 87. The radiologist wrote in the CT findings as follows: "[t]he ventricular system is normal in size, shape and position. I see no mass, mass effect or abnormal extra-axial fluid collections. I see no appreciable infarctions by CT. There is no intracerebral or subarachnoid hemorrhage. The basilar and perimesencephalic cisterns are clear and patent. The posterior cranial fossa structures are normal. The orbits and paranasal sinuses are unremarkable. I see no calvarial fractures. There is normal aeration of the mastoid air cells and middle ears." Def.'s UMF 46, Doc. 87. The "impression" on the CT report stated, "Normal head CT. No acute intracranial hemorrhage, mass or mass effect." Def.'s UMF 47, Doc. 87.

## IV.   **Dr. Durso diagnosed and treated Plaintiff, and Plaintiff was discharged**.

Dr. Durso documented in the Assessment and Plan section of the medical record as follows:

Uncontrolled [hypertension], no evidence of end organ dysfunction. [Blood pressure] improved with meds, question of non-compliance though jail records state they are administering. [Discharge] back to custody. I have discussed my presumptive diagnosis with the patient based on history, physical exam and available data. The patient expresses understanding that diagnoses in the emergency department are not always 100% accurate and are often based on limited data. The patient states understanding of the importance of following up as instructed and also endorses understanding and compliance with the strict return precautions we have discussed, as well as the consequences of not following through with the established plan. All questions and concerns of the patient have been answered and addressed in a satisfactory manner. Return precautions were discussed. Patient verbalizes understanding.

Def.'s UMF 48, Doc. 87.

11

Dr. Durso testified that the official emergency department discharge is done by a nurse but he would have seen Plaintiff before he was discharged. Def.'s UMF 49, Doc. 87, *citing* Durso Dep., Doc. 87, Exhibit C at 94:21-95:9. Dr. Durso testified that if he had had any concerns about Plaintiff during their predischarge discussion he "absolutely" would not have hesitated to keep Plaintiff in the hospital longer. Def.'s UMF 50, Doc. 87, *citing* Doc. 87, Durso Dep., Exhibit C at 94:21-95:9. Plaintiff was in the emergency department for over four and a half (4 ½) hours before his discharge. Def.'s UMF 51, Doc. 87

When asked to describe his thought process in discharging Plaintiff from the emergency department, Dr. Durso testified,

> So based on his reports from the jail guard that he may have had some unsteadiness and dizziness, I considered stroke and TIA. And he had an appropriate workup and exam based on that complaint -- I guess, not complaint -- based on that possibility. Based on his complaints of headache and hypertension, again, he had an appropriate workup for those complaints and an appropriate intervention for his hypertension, based on the numbers we had for his blood pressure when he arrived. During his four-hour observation in ER, at no time during which did he tell me or anybody else that he had any different or any worsening complaints, and based on the nurse's notes, he appeared to feel pretty well upon the reevaluation and post the time of discharge. And then it's my practice to go back in to see a patient immediately before I discharge them to explain to them what happened, what we did, and what we didn't do, address any concerns that he or she may have, answer questions, and explain to them where to go from here, that they're being discharged, and any reasons that they should come back."

Def.'s UMF 52, Doc. 87, *citing* Doc. 87-3, Durso Dep., Ex. C at 93:11-94:13.[4]

Dr. Durso testified that he discharged Plaintiff because, "[w]e had a diagnosis which was addressed. Patient was stable. There was no reason for any further testing or for hospital admission." Def.'s UMF 53, Doc. 87, *citing* Doc. 87-3, Durso Dep., Ex. C at 62:9-18. Dr. Durso believed that Plaintiff's workup did not reflect that he was having a hypertensive crisis while in

---

[4] Plaintiff asserted in his UMF 19 that Dr. Durso did not consider a stroke. Doc. 71 at 6-7. This assertion is not supported by the cited record. *Id.* Moreover, this assertion is directly contradicted by the tests and imaging performed and Dr. Durso's testimony.

the emergency department because he "didn't have any indication of organ damage from his blood pressure being high" and a hypertensive crisis is when "the patient has a high blood pressure in conjunction with some indication of end organ -- i.e., brain, liver, heart, kidney -- damage resulting from that blood pressure." Def.'s UMF 54, Doc. 87, *citing* Doc. 87-3, Durso Dep., Ex. C at 58:7-59:12, 60:10-20.

Defendant PHS stated in written discovery that "certain care provided was provided by physicians who are expected to use their clinical judgment based on their education, training and experience, which cannot be regulated, dictated or subject to written policies or rules. Similarly, nurses rely on their training and education as well as clinical experience. PHS is providing training materials provided to nurses which may serve as information for them in the ED, PHS/HARRISON 02720-02749. Each patient presents with individual signs and symptoms, thus there are no 'rules' guiding the assessment of an individual. PHS will continue to search for responsive guidelines and if such guidelines are located, will supplement this response. PHS is unaware of any policy, procedure, guidelines, rules or protocols that varies depending on a patient's insurance coverage." Def.'s UMF 55, Doc. 87. Plaintiff cited to certain continuing nursing education training material produced by a third-party for nurses for identifying and treating strokes.  Pl.'s UMF 31, Doc. 71.

Defendant PHS produced a report from expert Dr. Erik Barton, who is board certified in emergency room medicine and has been providing care in that capacity for over 30 years. Def.'s UMF 56, Doc. 87. Dr. Barton's report states,

> It is my opinion that Dr. Durso and the medical staff at the emergency room at Plains Regional Medical Center met the standard of care on May 16th, 2019. Mr. Harrison presented with hypertension and signs of very high blood pressure due in large part to his refusal to take prescribed medication intended to treat that high blood pressure. He presented with a nonspecific set of symptoms and Dr. Durso appropriately ordered the testing designed to diagnose the cause of his symptoms. The reported CT scan was at normal limits and Dr. Durso observed this patient and appropriately discharged him with instructions for follow up care and observation

> at the jail. The reported behavior of the patient demonstrated an ability to eat and
> to converse and was inconsistent with a stroke or CT. The discharge was
> appropriate.

Def.'s UMF 57, Doc. 87. Dr. Barton testified that Plaintiff's symptoms were non-specific when he

presented to the emergency department. Def.'s UMF 58, Doc. 87. Dr. Barton testified that

Plaintiff's workup was appropriate and that it was proper for Plaintiff to be discharged. Def.'s

UMFs 59, 60, Doc. 87. Dr. Barton testified that a full work up was done for Plaintiff. Def.'s UMF

61, Doc. 87.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). The moving party bears

the initial burden of showing there is no genuine dispute as to any material fact. *McGarry v. Bd.*

*of Cnty. Comm'rs of Cnty. of Pitkin*, 175 F.3d 1193, 1198–99 (10th Cir. 1999). If the moving party

meets its initial burden, the burden shifts to the nonmovant to show a genuine dispute of material

fact. *Id.*

"[T]he mere existence of some alleged factual dispute between the parties will not defeat

an otherwise properly supported motion for summary judgment; the requirement is that there be

no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

As the Tenth Circuit has explained, "mere assertions and conjecture are not enough to survive

summary judgment." *York v. AT&T*, 95 F.3d 948, 955 (10th Cir. 1996). To avoid summary

judgment, a party "must produce specific facts showing that there remains a genuine issue for trial

and evidence significantly probative as to any [material] fact claimed to be disputed." *Branson v.*

*Price River Coal Co.*, 853 F.2d 768, 771-72 (10th Cir. 1988) (quotation marks and citations

omitted).

"A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1306 (10th Cir. 2017) (quotation marks and citation omitted).

When making this determination, the Court keeps two principles in mind. First, while the Court must draw all "reasonable inferences … in the light most favorable to the non-moving party*," id*. at 1261, that party's "version of the facts must find support in the record," *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). Second, the Court's role is not to weigh the evidence or decide any issues of credibility, but to assess the threshold issue of whether a genuine issue exists as to material facts requiring a trial. *See Liberty Lobby*, 477 U.S. at 249, 255.

## DISCUSSION

## I.  <u>Plaintiff's Motion for Leave to File Amended Complaint (Doc. 39) is DENIED as moot.</u>

Plaintiff seeks leave to amend his complaint to add more detailed factual allegations to support his EMTALA claim. He asserts that additional factual allegations may be necessary as he initially filed this case in state court, and federal pleading standards differ from New Mexico state court pleading standards.

The Court should freely give leave to amend when justice so requires. *See* Fed. R. Civ. P. 15(a)(2). "The purpose of the Rule is to provide litigants the maximum opportunity for each claim to be decided on the merits rather than procedural niceties." *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006).  That said, "[a] district court should refuse leave to amend only upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment."

*Wilkerson v. Shinseki*, 606 F.3d 1256, 1267 (10th Cir. 2010) (citations omitted).  In the absence of one of these grounds, leave to amend should be freely given.  *Triplett v. LeFlore Cty., Okl.*, 712 F.2d 444, 446 (10th Cir. 1983).  Determining whether to grant leave to amend a pleading is an exercise in the Court's discretion.  *State Distributor's, Inc. v. Glenmore Distilleries, Co.,* 738 F. 2d 405, 416 (10th Cir. 1984); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962).

The most important factor in deciding a motion to amend the pleadings is "whether the amendment would prejudice the nonmoving party." *Minter,* 451 F.3d at 1207; *cf. Bylin v. Billings*, 568 F.3d 1224, 1229 (10th Cir. 2009) ("Rule 15 was designed to facilitate the amendment of pleadings except where prejudice to the opposing party would result." (alteration, quotation marks, and citation omitted)). "Courts typically find prejudice only when the amendment unfairly affects the defendants in terms of preparing their defense to the amendment." *Minter*, 451 F.3d at 1208 (quotation marks and citation omitted). "Most often, this occurs when the amended claims arise out of a subject matter different from what was set forth in the complaint and raise significant new factual issues." *Id.*

Plaintiff seeks to amend his complaint to add greater factual detail to his EMTALA claim to conform to federal pleading standards.  He does not argue in his motion that he seeks to add factual allegations to other claims. Plaintiff asserts that the amendments are intended to "streamline the litigation by ensuring that the pleadings are clear and compliant with federal standards" after the case was removed to federal court.  Doc. 49 at 6. In other words, it appears Plaintiff sought to avoid a motion to dismiss for failure to state a claim.  However, after Plaintiff filed the motion to amend, the parties filed their summary judgment motions.  Notably, it appears that the motion to amend complaint does not affect the pending motions for summary judgment.  Plaintiff does not request that the Court hold off on ruling on the summary judgment motions if the motion were

granted, and he did not file a Rule 56(d) motion for additional discovery in response to Defendant

PHS's summary judgment motion on the EMTALA claim. Plaintiff stated that "Plaintiff has not

requested additional discovery and is prepared to proceed with the existing record." Doc. 49 at 6.

Moreover, Plaintiff filed his own summary judgment motion on the EMTALA claim. It does not

appear that proceeding on the original complaint has restricted the arguments or evidence Plaintiff

has presented on summary judgment. Therefore, Plaintiff expressly requests that the Court rule on

the summary judgment motions, and it appears that the motion to amend does not affect the

summary judgment motions.

Because the Court enters summary judgment on the EMTALA claim as explained below,

the Court denies the motion to amend as moot. The motion to amend to conform to federal

pleading standards is also moot, as the Court will remand the state law claims to state court.

## II. **Plaintiff failed to create a genuine dispute of material fact as to his EMTALA claim (Count V) and summary judgment in favor of Defendant PHS is appropriate.**

Plaintiff asserts an EMTALA claim (Count V) against Defendant PHS, alleging that it (1)

failed to screen Plaintiff according to its standard screening procedures and (2) failed to stabilize

him before discharging him or transferring him. "Courts have recognized a private right of action

under EMTALA to allege violations of two primary obligations of participating hospitals." *Ward

v. Lutheran Med. Ctr.*, 769 F. App'x 595, 599 (10th Cir. 2019) "First, the hospital must conduct an

initial medical examination to determine whether the patient is suffering from an emergency

medical condition." *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 796 (10th Cir. 2001)*.* "Second,

if an emergency medical condition exists, the hospital must stabilize the patient before transfer or

release." *Ward,* 769 F. App'x at 599*,* citing *Delaney v. Cade*, 986 F.2d 387, 392 (10th Cir. 1993)

(noting that a hospital can violate the EMTALA "by failing to stabilize a patient's emergency

medical condition before transferring or releasing the patient"). "An EMTALA complaint must allege a violation of at least one of these obligations. The statute does not provide a remedy for negligence or medical malpractice." *Ward,* 769 F. App'x at 599, *citing Repp v. Anadarko Mun. Hosp.*, 43 F.3d 519, 522 (10th Cir. 1994).

Both Plaintiff and Defendant PHS moved for summary judgment. As explained below, Plaintiff's EMTALA claim fails on both prongs. First, the record does not reflect that Defendant PHS failed to follow the standard screening procedures in the emergency department at Plains Regional Medical Center. Plaintiff failed to cite or put into the record Defendant's standard screening procedure or show a deviation from that standard screening procedure. Moreover, the record demonstrates that Defendant PHS screened Plaintiff but at most simply misdiagnosed him or failed to identify his stroke. Plaintiff's assertions may be relevant to a medical negligence or malpractice claim, but do not create a genuine dispute of material fact as to an EMTALA claim.[5]

Second, Plaintiff did not create a genuine dispute of material fact that Defendant PHS had actual knowledge of an unstabilized emergency medical condition before transferring or discharging him.

A.    **Appropriate Medical Screening Examination.**

Plaintiff asserts that Defendant PHS failed to screen him according to its standard screening procedures. "EMTALA requires hospitals to provide an individual requesting treatment in its emergency room with 'an appropriate medical screening examination *within the capability of the hospital's emergency department*, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition ... exists.'" *Koel v.*

---

[5] The Court does not find whether Plaintiff created a genuine dispute of material fact as to a negligence or medical malpractice claim. Rather, the Court simply observes that Plaintiff's assertions are more relevant to a negligence claim than an EMTALA claim.

*Citizens Med. Ctr., Inc.*, 128 F.4th 1329, 1334 (10th Cir. 2025), *citing* 42 U.S.C. § 1395dd(a) (emphasis added). "We give appropriate deference to the existing screening procedures utilized by the hospital, because it, not a reviewing court, is in a superior position to determine its own capabilities and limitations." *Koel,* 128 F.4th at 1334–35, *quoting Phillips*, 244 F.3d at 797. "Accordingly, we inquire only whether the hospital *adhered* to its own procedures; we do not assess the *adequacy* of such procedures." *Koel,* 128 F.4th at 1334-35, *citing Rupp*, 43 F.3d at 522 & n.4; *see also id.* at 523 (mere de minimis variations or "slight deviations by a hospital from its standard screening policy" do not violate EMTALA).

Moreover, EMTALA is not a medical negligence law, and does not provide a remedy for negligence or malpractice, such as inadequate or inaccurate diagnosis. *Phillips*, 244 F.3d at 798–99.

"A hospital's obligation under EMTALA is measured by whether it treats every patient *perceived* to have the same medical condition in the same manner. 'Disparate treatment' is simply another term for describing or measuring a hospital's duty to abide by its established procedures. Unless each patient, regardless of perceived ability or inability to pay, is treated in a uniform manner in accordance with the existing procedures, EMTALA liability attaches." *Id.* at 797.

1.  <u>Plaintiff failed to carry his burden to cite to Defendant's standard screening procedures</u>.

Defendant PHS asserted that there was no standard screening procedure for these circumstances, but that doctors were expected to use their clinical judgment. Def.'s UMF 55, Doc. 87. In response, Plaintiff did not cite to, or provide in the record, the standard screening procedure at the emergency department at issue which Defendant PHS failed to follow.  For example, in *Koel,* the Tenth Circuit looked to the hospital's "relevant policies, rules, and practices as provided in the record by Citizens' Rules and Regulations, as well as Citizens' Bylaws. The two documents

describe rules and regulations for Citizens' medical staff, including, but not limited to, physician procedures and administrative duties." *Koel,* 128 F.4th at 1335. Plaintiff did not cite to any rules, regulations, or bylaws.  Rather, Plaintiff primarily cited to a continuing nursing education course provided by a third-party and written by a nurse, for nurses. Pl.'s Mot. Summ. J., Doc. 71 at ¶ 31, *citing* Doc. 71, Ex. 7. The continuing nursing education course is titled "Activating a Stroke Alert: a Neurological Emergency" and provides continuing education credit to nurses. *Id.*  First, Plaintiff does not establish that a continuing education course for nurses provided by a third-party established Plains Regional Medical Center's screening *procedures*. It is simply an educational course for nurses. Second, Plaintiff has not established that it provided screening rules or procedures which *physicians* or the hospital itself were expected to follow. Third, the continuing nursing education course does not establish *procedures* to be followed. It attempts to provide education on how to identify a stroke and provides background information on treatments. Because Plaintiff has not identified or cited to a standard screening procedure for evaluating a stroke *at the hospital or emergency department at issue*, Plaintiff's EMTALA claim fails.

Plaintiff also cites to expert testimony or opinion from Dr. Womack regarding whether Dr. Durso met the standard of care of a reasonable physician under similar circumstances.  *See* Pl.'s Resp., Doc. 81 at 11. Dr. Womack asserts that Dr. Durso failed to meet the standard of care based on certain misdiagnoses and omissions in his examination. *Koel v. Citizens Med. Ctr., Inc.*, 128 F.4th 1329, 1335 (10th Cir. 2025) (EMTALA, "unlike traditional state negligence or medical malpractice law, does not provide a remedy for an inadequate or inaccurate diagnosis"). But whether Dr. Durso met the standard of care is not relevant to an EMTALA claim against Defendant PHS. *See Id.* Dr. Womack did not (1) set forth Defendant PHS's screening procedure and (2) explain how Defendant PHS failed to follow its screening procedure in this case.

For example, Dr. Womack's expert affidavit summarily asserts that Defendant PHS failed to properly screen Plaintiff, but does not set forth Defendant PHS's standard screening procedures. Womack Aff., Doc. 81-7 at 4. Rather, Dr. Womack opines on the standard of care. But whether Plaintiff was *properly* treated is not relevant under an EMTALA claim, as Dr. Womack does not establish that Defendant PHS deviated from its standard screening procedure at the emergency department at Plains Regional Medical Center. EMTALA is not a medical negligence statute.

Moreover, Plaintiff cites to Dr. Durso's testimony or Dr. Womack's expert opinion for alleged deviations from Dr. Durso's own standard procedure in this case. However, a doctor's deviation from his own procedures or protocol does not establish an EMTALA claim. *Koel*, 128 F.4th at 1336 ("But whether a doctor adhered to his own standard procedure or protocol is irrelevant for purposes of EMTALA. Indeed, case law is clear that violations of EMTALA depend upon whether a *hospital* adhered to *its own standard procedures.*"). Reviewing the cited deposition testimony, it appears that Dr. Durso largely testified as to his own procedures. His testimony does not establish the screening procedures of Plains Regional Medical Center. If it does establish certain procedures of Defendant PHS, the record does not demonstrate that he deviated from it. Plaintiff attacks Dr. Durso's exercise of his clinical judgment, which goes toward a negligence claim, not an EMTALA claim.

2.    <u>Alternatively, Plaintiff has not demonstrated that Defendant PHS deviated from the alleged standard screening procedures.</u>

Alternatively, even assuming Plaintiff established Defendant PHS's standard screening procedures by citation to the record, Plaintiff has not created a genuine dispute of material fact that Defendant PHS deviated from it. Plaintiff specifically argues in his briefing that Defendant PHS failed to (1) check his walk or gait (because he was handcuffed) or (2) perform a CT angiogram or CT perfusion, which he asserts was required under the nursing educational material discussed

above. *See, e.g.* Pl.'s Reply, Doc. 114 at 9-10 (focusing on (1) failure to "walk" plaintiff and (2) failure to perform a CT angiogram or perfusion). As explained below, Plaintiff has not shown a deviation from Defendant PHS's standard screening procedure on either point.

First, Plaintiff asserts that Dr. Durso failed to observe Plaintiff ambulate or walk to test if he was suffering from a stroke. Plaintiff asserts he was treated unequally as he was not walked because he was handcuffed. But he fails to cite the record that it was a standard procedure at Defendant PHS's emergency department to "walk" a patient under these circumstances. Rather, Nurse Bradley testified that it would be unusual to ask Plaintiff to walk to observe his gait because his reported dizziness or unsteadiness would create a fall risk. Bradley Dep., Doc. 87, Ex. B at 41:1-7. Dr. Durso states that he cannot tell from the record whether or not he personally observed Plaintiff walk. Doc. 87, Exhibit C at 41:7-11. However, he pointed to the nurse's records which stated that Plaintiff ambulated independently. Durso Dep., Doc. 71-6, Ex. 6 at 38:1-8. Plaintiff has not established by citation to the record that Defendant PHS did not ambulate Plaintiff. Moreover, Plaintiff did not tell Dr. Durso that he was feeling unsteady on his feet. Doc. 87-3, Exhibit C at 90:7-10. In sum, Plaintiff has not established that Defendant PHS violated its standard screening procedures at the emergency department at Plains Regional Medical Center. Moreover, Plaintiff has not established by citation to the record that it violated Defendant PHS's standard procedures to consider a patient's or caregiver's statements regarding a dizziness and gait rather than observing them walk. Although Plaintiff asserts it is the standard of care to observe a patient walk, violating the standard of care does not establish an EMTALA claim.

Plaintiff asserts that contrary to his usual practice, Dr. Durso recorded in the "History of Present Illness" section of the medical records that Plaintiff was dizzy and unsteady in his gait from jail staff. He asserted this should have been reported by Plaintiff directly, and this constitutes

unequal treatment.  Doc. 71 at ¶ 14. Plaintiff has not established by citation to the record that receiving information from others regarding a patient's condition violates Defendant PHS's standard screening procedures.  Rather, Dr. Durso testified that the "History of Present Illness" form is "basically a narrative of what information we're given from patient or persons related to patient or taking care of patient, to describe why they're in the emergency room."  Doc. 87-3, Exhibit C, at 14:20-15:6.

Moreover, Dr. Durso did not ignore the reports of unsteadiness or dizziness. Dr. Durso clearly considered the statements regarding Plaintiff's gait and dizziness, considered a stroke, performed some tests to identify a stroke, but ultimately diagnosed him with hypertension. Dr. Durso testified that "based on his reports from the jail guard that he may have had some unsteadiness and dizziness, I considered stroke and TIA.  And he had an appropriate workup and exam… based on that possibility.  Based on his complaints of headache and hypertension, again, he had an appropriate workup for those complaints and an appropriate intervention for his hypertension, based on the numbers we had for his blood pressure when he arrived. During his four-hour observation in ER, at no time during which did he tell me or anybody else that he had any different or any worsening complaints, and based on the nurse's notes, he appeared to feel pretty well upon the reevaluation and post the time of discharge."  Doc. 87, Exhibit C at 93:11-94:6. Plaintiff's arguments may or may not be relevant to a breach of the standard of care (such as misdiagnosis), but they do not establish a failure to screen.

Next, Plaintiff asserts that Dr. Durso failed to order a CT angiogram or CT perfusion, which he asserts was required under the nursing educational material. As explained above, this educational material does not establish Defendant PHS's standard screening procedures at its emergency department at Plains Regional Medical Center. Even if it did, the third-party

educational course which Plaintiff asserts establishes PHS's standard screening procedures does not require a CT angiogram or CT perfusion. It states that "[d]iagnostic imaging varies by hospital. At a minimum, patients require a CT scan of the brain without contrast. Some hospitals use magnetic resonance imaging; many have moved to CT angiogram and CT perfusion studies. The noncontrast CT of the brain is the gold standard." Doc. 71-7 at 4. Here, Dr. Durso ordered a CT without contrast due to dizziness, which under the educational material is the "gold standard." Doc. 87, Def.'s UMF at ¶¶ 45-47. Even if it were not the "gold standard", the educational material gives the option of CT without contrast, CT angiogram, or CT perfusion, and does not mandate one over the other. Plaintiff has not established by citation to the record that a CT angiogram or perfusion is a standard procedure provided to patients with the same perceived medical condition of dizziness at the emergency department at Plains Regional Medical Center.[6]

To the extent there were standard screening procedures, there was no testimony that PHS failed to conduct them in this case. For example, Nurse Bradley triaged Plaintiff. Plaintiff's argument section of his brief (Doc. 114) does not identify deficiencies in her triage. Moreover, Dr. Durso testified regarding a series of questions he asks. For example, he describes the "Review of Systems" as follows: "it's a series of question we ask, not necessarily related to the patients' complaint, but just to get a further overview of their general state of health at the time of visit." Doc. 87-3, Exhibit C at 21:1-25. But Plaintiff does not establish that Defendant PHS deviated from any standard screening procedures.

---

[6] The Court does not determine whether the decision to only perform a CT without contrast constitutes medical negligence or falls below the standard of care. It simply notes that a CT angiogram was not required under the continuing nursing education course cited by Plaintiff as Defendant PHS's alleged standard screening procedures.

Finally, Plaintiff alleges that he was treated differently because he was a detainee at Curry County Detention Center and he had a note in his medical record alleging he was a malingerer. But EMTALA is a strict liability statute, in which "motives are irrelevant to whether [Plaintiff] was treated in a manner consistent with [Defendant's] existing procedures. This circuit, like many others, does not require any particular motive for EMTALA liability to attach." *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 798 (10th Cir. 2001). "EMTALA looks only at the participating hospital's *actions*, not motives." *Id.* (emphasis added). As explained above, Plaintiff has not demonstrated that Defendant PHS's actions in this case deviated from its standard screening procedures.

### 3. Conclusion.

In sum, Plaintiff has not carried his burden of citing to Defendant PHS's standard screening procedures or demonstrating that Defendant PHS treated him differently from others with the same perceived medical condition. Alternatively, even if he provided Defendant PHS's standard screening procedure, Plaintiff has not demonstrated that Defendant PHS violated that procedure by (1) failing to "walk" him and (2) performing a noncontrast CT instead of a CT angiogram or perfusion. Dr. Durso diagnosed him with hypertension and provided him with medication. The alleged failure to diagnose Plaintiff properly must be addressed in a negligence or malpractice claim, and not an EMTALA claim.

### B.    Stabilization and Transfer.

Plaintiff asserts that Defendant PHS transferred him without stabilizing his emergency medical condition in violation of 42 U.S.C. § 1395dd(c)(1).  As explained below, this claim fails as Plaintiff failed to create a genuine dispute of material fact by citation to the record that Defendant PHS had actual knowledge of an unstabilized emergency medical condition when it transferred or discharged him.

The second requirement under EMTALA provides that " 'if an individual at a hospital has an emergency medical condition which has not been stabilized ... , the hospital may not transfer the individual' unless certain conditions are met." *Urb. By & Through Urb. v. King*, 43 F.3d 523, 525 (10th Cir. 1994), quoting in part 42 U.S.C. § 1395dd(c)(1). "A plain reading of the statute reveals *actual knowledge* of an unstabilized emergency medical condition as a requirement to establish liability." *Id.* (emphasis added). "In other words, EMTALA's stabilization and transfer requirements do not apply *until* the hospital determines and has *actual knowledge* of the individual's unstabilized emergency medical condition." *Koel*, 128 F.4th at 1336. "[K]nowledge of a possible diagnosis does not equate to having actual knowledge of a diagnosis. Simply put, EMTALA does not require hospitals to provide stabilizing measures to any and all *possible* emergency medical conditions." *Id.* at 1337.

Defendant PHS carried its initial burden of demonstrating that it did not have actual knowledge (1) by showing that it diagnosed Plaintiff with hypertension and treated him for hypertension, and (2) by providing deposition testimony by Dr. Durso that he believed he had diagnosed, treated, and stabilized Plaintiff.  Moreover, a radiologist reported that no stroke was visible on a CT scan. In response, Plaintiff cites to nothing in the record to demonstrate that Defendant PHS had actual knowledge that he had an unstabilized emergency condition. Doc. 114 at 10; Doc. 81 at 12. Although Plaintiff cited to some symptoms he asserts are consistent with a stroke, those symptoms were non-specific and he does not cite to anything suggesting that Defendant PHS was aware that he was suffering a stroke. Dr. Durso diagnosed him with another condition and treated him. Therefore, the Court concludes that Plaintiff has failed to create a genuine dispute of material fact that Defendant PHS had actual knowledge of an unstabilized

emergency medical condition and transferred him without stabilizing his medical condition in violation of 42 U.S.C. § 1395dd(c)(1).

### III.    The Court declines to exercise supplemental jurisdiction over the remaining state law claims.

Because all claims over which the Court has original jurisdiction have been dismissed, the Court declines to exercise supplemental jurisdiction over the remaining state law claims, pursuant to 28 U.S.C. § 1367(c)(3).

With the dismissal of the federal EMTALA claim against Defendant PHS, the Court does not have federal question jurisdiction over any of the remaining claims. The remaining counts solely assert state law claims, and no party asserted in the briefing on the motion to remand that the Court has federal question jurisdiction over other claims.

Moreover, it is undisputed that there is no diversity jurisdiction. The parties already briefed jurisdictional issues relating to Plaintiff's motion to remand. No party asserted that this Court has diversity jurisdiction over the claims in this case, and it appears that complete diversity does not exist. The relevant time for determining the existence of complete diversity is the filing of the complaint. *Siloam Springs Hotel, L.L.C. v. Century Sur. Co.*, 781 F.3d 1233, 1239 (10th Cir. 2015) ("It is clear the relevant time period for determining the existence of complete diversity is the time of the filing of the complaint."); *Grimes v. Molish*, 785 F. App'x 576, 579 (10th Cir. 2019) ("having dismissed Grimes's constitutional claims … and having also correctly determined that the second amended complaint failed to allege a valid basis for diversity jurisdiction, the district court acted well within its discretion in declining to exercise supplemental jurisdiction over Grimes's state law claims."). Plaintiff alleges he is a resident of Bernalillo County, New Mexico, which no party has disputed. *See* Complaint, Doc. 1-1 at ¶ 1. Curry County is local entity in New Mexico, and the

27

state law claims remain against it. *Id.* at ¶ 3. PHS is a New Mexico corporation with its principal

place of business in Albuquerque, New Mexico. *Id* at ¶ 10. Moreover, Radiology Associates of

Albuquerque is a New Mexico corporation with its principal place of business in Albuquerque. *Id.*

at ¶ 17. Therefore, it is clear based on the pleadings that complete diversity does not exist, and the

Court lacks diversity jurisdiction over these claims.

A district court "may decline to exercise supplemental jurisdiction over a" state claim "if

... the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. §

1367(c)(3). Although declining to exercise supplemental jurisdiction is discretionary, the Tenth

Circuit has held that district courts should usually decline to exercise jurisdiction over state claims

when federal claims no longer remain: "When all federal claims have been dismissed, the court

may, and usually should, decline to exercise jurisdiction over any remaining state claims." *Koch*

*v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011) (quoting *Smith v. City of Enid ex rel.*

*Enid City Comm'n*, 149 F.3d at 1156); *see also Gaston v. Ploeger,* 297 Fed. Appx 738 (10th Cir.

2008) (noting, after summary judgment was entered on federal claims, the "preferred practice" is

to decline to exercise supplemental jurisdiction over state law claims). That conclusion is

consistent with the Supreme Court's statement that:

> [n]eedless decisions of state law should be avoided both as a matter of comity and
> to promote justice between the parties, by procuring for them a surer-footed reading
> of applicable law. Certainly, if the federal claims are dismissed before trial, even
> though not insubstantial in a jurisdictional sense, the state claims should be
> dismissed as well.

*United Mine Workers of Am. v. Gibbs*, 383 U.S. at 726, 86 S.Ct. 1130 (footnote omitted). Here,

the Court has dismissed all claims over which it has original jurisdiction before trial. The remaining

claims focus on medical negligence or malpractice allegations. The Court finds it appropriate to

decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c)(3).

Moreover, the Court has weighed the *Gibbs* factors and concludes that declining to exercise supplemental jurisdiction over the state law claims is appropriate. "In deciding whether to exercise jurisdiction, the district court is to consider 'judicial economy, convenience, fairness, and comity.' " *Nielander v. Bd. of Cnty. Comm'rs of Cnty. of Republic, Kan.*, 582 F.3d 1155, 1172 (10th Cir. 2009), *quoting in part Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988). The Court finds that these factors weigh in favor of declining to exercise supplemental jurisdiction under § 1367(c)(3). The Court should decline to exercise supplemental jurisdiction "as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of Am. v. Gibbs*, 383 U.S. at 726, 86 S.Ct. 1130 (footnote omitted). Comity and federalism clearly favor remanding these state law claims to state court. *Thatcher Enterprises v. Cache County Corp.*, 902 F.2d 1472, 1478 (10th Cir. 1990) ("[n]otions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary.").

Next, judicial economy does not favor keeping this case as this court has not invested significant time on the *supplemental* claims. Although it has adjudicated federal claims in this case, it has not spent significant time adjudicating the state law claims.

Finally, as to the convenience and extent of pretrial litigation factors, the parties have expended effort in this case. *Anglemyer v. Hamilton County Hosp.*, 58 F.3d 533, 541 (10th Cir. 1995) (district court must "be aware of the extent of the litigants' pretrial efforts."). But it is unclear why that effort would be wasted if the Court remanded these state law claims to the state court, or why such effort could not be used to streamline state-court litigation. Moreover, it is unclear why upon remand the parties would not be able to use their dispositive motions, which have been briefed, to streamline briefing in state court.

The procedural posture of this case does not mandate that the Court exercise supplemental jurisdiction. The Supreme Court has stated that "in the usual case in which all federal-law claims are eliminated before trial" the above factors will weigh toward declining to exercise supplemental jurisdiction. *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988). Although this case has proceeded to briefing on summary judgment, the Tenth Circuit has held that a district court does not abuse its discretion in declining to exercise supplemental jurisdiction even where a case has reached briefing on summary judgment. *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011) (noting that district court may, and usually should, dismiss supplemental claims at summary judgment stage after original jurisdiction claims are dismissed); *Bauchman for Bauchman v. W. High Sch.*, 132 F.3d 542, 549 (10th Cir. 1997) ("If federal claims are dismissed before trial, leaving only issues of state law, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.") (internal quotation marks omitted); *see also Koel v. Citizens Med. Ctr., Inc.*, No. 2:21-CV-2166-HLT, 2023 WL 6599136, at *2 (D. Kan. Oct. 10, 2023) (declining supplemental jurisdiction over state medical malpractice claims even after discovery completed). Moreover, the record does not reflect that remanding this case will create an undue burden on the parties, or that there are compelling reasons to override the notions of comity and federalism. *Thatcher Enters. v. Cache Cnty. Corp.,* 902 F.2d 1472, 1478 (10th Cir. 1990). This matter has not been set for trial, and the Court has not entered a scheduling order setting trial preparation deadlines. Therefore, the record (as reflected on the docket) does not demonstrate that trial preparations have begun.

Therefore, the Court declines to exercise supplemental jurisdiction over the state law claims and remands those state law claims to state court.

IV.    **Defendant PHS's Motion to Exclude Plaintiff's Experts' Affidavits (Doc. 91).**

Defendant PHS moves to exclude Plaintiff's experts' affidavits. Doc. 91. However, Defendant PHS is entitled to summary judgment in its favor on the EMTALA claim even if the Court considers the affidavits. Therefore, the Court denies the motion to exclude as moot only to the extent it bears on the EMTALA claim.

## CONCLUSION

For the reasons stated above, the Court enters summary judgment in Defendant PHS's favor on the EMTALA claim (Count V) and therefore dismisses that claim.[7] Because all claims over which the Court has original jurisdiction have been dismissed, the Court declines to exercise supplemental jurisdiction over the state law claims and remands those claims to the Ninth Judicial District Court, Curry County, New Mexico.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Leave to Amend Complaint (Doc. 39) is **DENIED** as moot.

**IT IS FURTHER ORDERED** that Presbyterian Healthcare Services' Motion to Exclude Plaintiff's Experts' Affidavits (Doc. 91) is **DENIED** as moot, to the extent it bears on the EMTALA claim.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Partial Summary Judgment (Doc. 71) is **DENIED**.

---

[7] Plaintiff asserted a punitive damages claim against Defendant PHS. Generally, punitive damages are a form of relief and not a separate claim. *Mason v. Texaco, Inc.,* 948 F.2d 1546, 1554 (10th Cir. 1991) ("A punitive damage claim is not an independent cause of action or issue separate from the balance of a plaintiff's case."); *Sanchez v. Clayton*, 1994-NMSC-064, ¶ 12 ("An award for punitive damages must be supported by an established cause of action."). However, only to the extent Plaintiff seeks punitive damages based on the EMTALA claim, it is also dismissed.  This opinion does not address whether Plaintiff may assert punitive damages based on state law claims and leaves that for the state court.

**IT IS FURTHER ORDERED** that Defendant Presbyterian Healthcare Services' Motion for Summary Judgment on Plaintiff's Direct Claims Against it and Claims for Vicarious Liability for its Employees (Doc. 55) is **GRANTED IN PART**. The Court enters summary judgment on the EMTALA claim (Count V) in Defendant PHS's favor and dismisses that claim. The Court does not rule on the remaining claims addressed in that motion.

**IT IS FURTHER ORDERED** that this case is remanded to the Ninth Judicial District Court, Curry County, New Mexico. The Clerk of Court is directed to take the necessary actions to remand this case. Because the Court declines to exercise supplemental jurisdiction over the remaining claims in this case, the Court does not rule on the remaining motions in this case which were not addressed in this opinion.

_____/S/_____

KEA W. RIGGS
UNITED STATES DISTRICT JUDGE